[No. B219113. Second Dist., Div. Seven. Jan. 25, 2012.]

ALLEN RAY KLEIN et al., Plaintiffs and Appellants, v.
CHEVRON U.S.A., INC., et al., Defendants and Respondents.

**COUNSEL**

Law Office of Timothy P. Dillon, Timothy P. Dillon; Carlson, Calladine & Peterson, Guy D. Calladine; Kellogg, Huber, Hansen, Todd, Evans & Figel and David C. Frederick for Plaintiffs and Appellants.

Latham & Watkins, Darius Ogloza, Brendan A. McShane, Heather L. Potts, Connie D. Sardo and Richard P. Bress for Defendants and Respondents.

Arnold & Porter, Ronald C. Redcay and Sean Morris for BP West Coast Products LLC as Amicus Curiae on behalf of Defendants and Respondents.

Greensfelder, Hemker & Gale and Mary Ann L. Wymore for Equilon Enterprises LLC as Amicus Curiae on behalf of Defendants and Respondents.

Zelle Hofmann Voelbel & Mason, Daniel S. Mason and Joseph W. Bell for ConocoPhillips Company as Amicus Curiae on behalf of Defendants and Respondents.

Steptoe & Johnson, Ruth D. Kahn and Patrick J. Foley for National Association of Convenience Stores and Society of Independent Gasoline Marketers of America as Amici Curiae on behalf of Defendants and Respondents.

Pillsbury Winthrop Shaw Pittman and Kevin M. Fong for Western States Petroleum Association as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**ZELON, J.—**

### INTRODUCTION

Plaintiffs filed a class action complaint against defendant and respondent Chevron U.S.A., Inc., asserting claims for violation of the unfair competition law (Bus. & Prof. Code, § 17200) (UCL or section 17200), violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) (CLRA), breach of contract and unjust enrichment. Plaintiffs' claims are predicated on Chevron's practice of purchasing wholesale motor fuel in gallon units at a standardized temperature of 60 degrees Fahrenheit, but selling motor fuel to California consumers at an average temperature of approximately 70 degrees. Plaintiffs allege that, because motor fuel expands as it is heated, Chevron's failure to compensate for temperature increases in retail motor fuel, or to disclose the effects of such increases, harms consumers in several ways. First, consumers receive less motor fuel—measured by mass and energy—than they would receive if Chevron adjusted for temperature increases. Second, consumers are led to believe that each gallon of motor fuel contains a standardized amount of energy, when, in fact, the energy content varies depending on the temperature of the fuel at the time of purchase. Third, consumers are unable to determine the actual price of motor fuel or to compare prices between retailers. Fourth, Chevron is able to collect and retain more motor fuel taxes from consumers than it is required to pay to the government.

Chevron filed a demurrer arguing that, as a matter of law, it could not be sued for failing to adjust the temperature of retail motor fuel because California law permitted the practice. The trial court sustained Chevron's demurrer to plaintiffs' claims for breach of contract, unjust enrichment and "unlawful" business practices under section 17200. However, the court overruled Chevron's demurrer to plaintiffs' CLRA claim and their claims for "unfair" and "fraudulent" business practices under section 17200.

Several months after the court issued its ruling, the California Energy Commission released a statutorily mandated report examining the benefits of implementing "Automatic Temperature Compensation" (ATC) fuel pump technology that would compensate for temperature increases in retail motor fuel. The report concluded that consumers would not realize any economic benefit from requiring retailers to implement the use of ATC fuel pumps.

Chevron filed a motion for judgment on the pleadings arguing that, in light of the California Energy Commission's (CEC) report, the trial court should dismiss plaintiffs' remaining claims under the judicial abstention doctrine. The trial court granted the motion, ruling that the CEC report demonstrated that the Legislature intended to address the issues in plaintiffs' complaint and that adjudicating plaintiffs' claims would improperly enmesh the court in complex areas of economic policy.

On appeal, plaintiffs argue that the trial court erred in (1) dismissing their claims arising under the CLRA and the "unfair" and "fraudulent" prongs of the UCL pursuant to the judicial abstention doctrine and (2) sustaining Chevron's demurrer to their claims for breach of contract, unjust enrichment and "unlawful" business practices under the UCL. Chevron argues that we should affirm the trial court's order granting its motion for judgment on the pleadings, or, alternatively, reverse the trial court's order overruling Chevron's demurrer to plaintiffs' UCL and CLRA claims.

We reverse the trial court's order granting Chevron's motion for judgment on the pleadings and affirm in part and reverse in part its order on Chevron's demurrer.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Facts Regarding the Effect of Temperature on Motor Fuel*[1]

1. *The effect of temperature increases on retail motor fuel*

Motor fuel expands in volume as it is heated. As a result of this thermal expansion, a gallon of motor fuel at a warmer temperature has less mass and less energy content than a gallon of motor fuel at a cooler temperature. A temperature increase of 15 degrees causes motor fuel to expand in volume by

---

[1] The factual summary in this section is based on the allegations in plaintiffs' third amended complaint, which are assumed to be true for the purposes of this appeal. (See *McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138, 1144 [87 Cal.Rptr.2d 95] [when reviewing a decision to grant a motion for judgment on the pleadings or to sustain or overrule a demurrer, appellate court "assum[es] the truth of the pleadings"].)

approximately 1 percent, with a corresponding 1 percent decrease in energy output. For example, when 231 cubic inches of motor fuel, which equals one volumetric gallon, is heated from 60 degrees Fahrenheit to 75 degrees Fahrenheit, the motor fuel will expand to occupy a volume of approximately 233 cubic inches.

To avoid inequities that result from selling motor fuel at different temperatures, the National Bureau of Standards, in conjunction with the American Petroleum Institute, established an industry standard known as "ASTM-IP D 1250" (D 1250). This standard defines a "U.S. Petroleum Gallon" as 231 cubic inches of petroleum at 60 degrees Fahrenheit. The inclusion of a temperature component in the definition of a U.S. Petroleum Gallon "ensure[s] that the amount of fuel [and energy] contained in every defined 'gallon' [i]s exactly the same amount."

For purchases made at the wholesale level, Chevron and other participants in the petroleum industry use D 1250 to adjust for differences in the temperature of motor fuel. This practice is reflected in Business & Professions Code section 13520,[2] which mandates that, for any transaction involving the sale of 5,000 or more gallons of motor fuel, the distributor must offer to sell the fuel "[at the] temperature-corrected gallonage [of] 60 degrees."

However, when selling motor fuel at the retail level, Chevron does not compensate for increases in fuel temperature. Instead, Chevron sells retail motor fuel based solely on volume, measured in gallon units equaling 231 cubic inches. Because retail motor fuel sold to California consumers is, on average, in excess of 70 degrees Fahrenheit, consumers receive less fuel (measured in terms of mass and energy) than they would receive if the fuel was delivered at the temperature-adjusted standard of 231 cubic inches at 60 degrees Fahrenheit. "As a result, consumers in California [are forced to] spend billions of dollars more each year to purchase the same quantity of motor fuel they would have received" if the fuel was adjusted to 60 degrees Fahrenheit. Moreover, because the temperature of retail motor fuel varies depending on location, "the amount of motor fuel that a consumer actually obtains at a given price varies from retailer to retailer and from purchase to purchase."

> 2. *Chevron's practice of selling non-temperature-adjusted fuel enables it to collect more in motor fuel taxes than it is required to pay to the government*

Chevron's failure to compensate for temperature increases in retail motor fuel also has significant tax consequences. In California, gasoline is subject to

---

[2] All further statutory citations are to the Business & Professions Code unless otherwise indicated.

a combined state and federal tax rate of approximately 36 cents per gallon, while diesel fuel is subject to approximately 42 cents of taxes per gallon. Under relevant tax laws, motor fuel distributors are required to pay the government motor fuel taxes at the wholesale level based on the total number of U.S. Petroleum Gallons purchased in each transaction.

At the retail level, Chevron passes these taxes on to consumers by charging approximately 36 cents for each gallon of gasoline and 42 cents for each gallon of diesel fuel. Because the temperature of retail motor fuel sold in California is, on average, above 60 degrees Fahrenheit, Chevron collects taxes on more gallons of motor fuel at retail than it is required to pay for at the wholesale level. For example, if Chevron purchased 10,000 U.S. Petroleum Gallons of motor fuel at wholesale, and sold that same motor fuel to consumers at a temperature of 75 degrees Fahrenheit, it would be required to pay taxes on 10,000 gallons of fuel, but would collect taxes from consumers on approximately 10,100 gallons.[3] Because Chevron and other retailers do not compensate for temperature increases in motor fuel at the retail level, California consumers pay "hundreds of millions dollars" more in purported "taxes" than the retailers actually pay to the government.

### 3.   *Temperature compensation technology*

Technology currently exists that would enable Chevron and other distributors to compensate for temperature differences in motor fuel sold at retail. The State of California has sanctioned the use of ATC retail fuel dispensers that would ensure that each gallon of motor fuel sold to consumers meets the standard measure of a U.S. Petroleum Gallon—the equivalent of 231 cubic inches at 60 degrees Fahrenheit. ATC pumps adjust each "gallon" of motor fuel to provide slightly more than 231 cubic inches when the temperature of the fuel exceeds 60 degrees Fahrenheit at the time of purchase. If, for example, the temperature of motor fuel was 75 degrees Fahrenheit at the time of purchase, an ATC pump would provide the consumer approximately 233 cubic inches of fuel for each pumped "gallon." Alternatively, if the temperature of motor fuel was less than 60 degrees Fahrenheit at the time of purchase, the ATC pump would provide slightly less than 231 cubic inches of fuel for each pumped "gallon."

Alternative technologies permit temperature compensation by "adjusting the . . . posted price per gallon depending on whether the temperature of the fuel is higher or lower than 60 degrees Fahrenheit, so as to achieve uniform

---

[3] We have added this numerical calculation to illustrate the nature of plaintiffs' tax-based claim. Although the example does not appear in plaintiffs' complaint, it is based on plaintiffs' allegation that a 15-degree temperature rise in motor fuel causes the fuel to expand by approximately 1 percent.

prices based on a consistent standard." For example, if the temperature of motor fuel was 75 degrees at the time of purchase, and the fuel was being offered at the price of $3 a gallon, the pump would provide 231 cubic inches of motor fuel for each pumped gallon, but charge slightly less than $3 for each such gallon.

The petroleum industry has voluntarily implemented the use of ATC fuel pump technology in Canada, where the average temperature of retail motor fuel is less than 60 degrees Fahrenheit. "[I]f the petroleum industry were to measure its deliveries of motor fuel to Canadian consumers [without ATC technology], the industry would deliver . . . substantially larger quantities of motor fuel per . . . 'gallon' [to Canadian consumers] than by measuring deliveries of motor fuel by the industry standard 'gallon' of 231 cubic inches of motor fuel at 60 degrees Fahrenheit."

However, the petroleum industry has pressured ATC pump manufacturers not to sell their equipment in places such as California, where the average temperature of motor fuel exceeds 60 degrees Fahrenheit. In sum, because the petroleum industry profits from selling retail motor fuel at a higher tempera-ture than it acquires the fuel at wholesale, the industry has supported the use of ATC technology in regions with colder climates, but opposed the use of such technologies in regions with warmer climates.

### 4. *California's investigation of temperature disparities in retail motor fuel*

In October 2007, the California Legislature passed section 13630, which required the CEC, in partnership with California's Department of Food and Agriculture (CDFA) and California's State Air Resources Board (CARB), to conduct a "comprehensive survey and cost-benefit analysis" of temperature variations in retail motor fuel. (*Id.*, subd. (a).)

Section 13630 directed the CDFA to conduct a survey determining the average temperature of retail motor fuel in California. (§ 13630, subd. (a)(1).) The statute further required that CEC use the results of the CDFA survey to prepare a "cost-benefit analysis" of several possible methods of remedying temperature variations in retail motor fuel, including "the installation of temperature correction or compensation equipment at the pump." (§ 13630, subd. (a)(2)(D).)

The statute ordered CDFA, CEC and CARB to "conduct public hearings on the results of the cost-benefit analysis and report to the Legislature regarding recommended legislation and regulations based on the results of the study not later than December 31, 2008." (§ 13630, subd. (d).)

### B.  Summary of Plaintiffs' Second Amended Complaint

#### 1.  General allegations

In March 2007, plaintiffs filed a class action lawsuit challenging Chevron's practice of purchasing wholesale motor fuel in U.S. Petroleum Gallons (231 cubic inches at 60 degrees Fahrenheit) and selling motor fuel at retail on a purely volumetric basis (231 cubic inches without reference to temperature). The second amended complaint, which was filed in March of 2008,[4] included four causes of action: (1) violation of the unfair competition law (§ 17200); (2) violation of the Consumers Legal Remedies Act (Civ. Code, § 1770); (3) breach of contract; and (4) unjust enrichment.

In the "Factual Background" portion of the second amended complaint, plaintiffs alleged that Chevron's practice of selling retail motor fuel in non-temperature-adjusted gallon units harms consumers in several ways. First, consumers are required to purchase significantly more fuel to obtain the same amount of energy they would receive if the fuel was sold in temperature-adjusted gallons. Second, selling non-temperature-adjusted motor fuel enables Chevron to collect and retain more taxes from consumers than it is required to pay to the government. Third, by advertising motor fuel in "gallon" units without adjusting for temperature increase or disclosing the effect of thermal expansion, Chevron deceives consumers into believing that each gallon of motor fuel will provide the same amount of energy output. Fourth, Chevron's sale of non-temperature-adjusted fuel has anticompetitive effects because consumers are unable to ascertain the true price of the fuel that they are purchasing or to accurately compare prices between different retail outlets.

#### 2.  Summary of individual causes of action

##### a.  Claims arising under the UCL and the CLRA

Plaintiffs' section 17200 claim alleged that, by selling motor fuel at a specified price per gallon without adjusting for temperature expansion or disclosing the effect of temperature increases on motor fuel, Chevron had committed numerous "unfair, unlawful or fraudulent practices" including, in relevant part (1) representing "motor fuel unit prices in terms of [a] standard unit of a 'gallon,' when in fact [Chevron] deliver[s] non-standard 'gallons' of motor fuel measured volumetrically without reference to temperature"; (2) "[c]harging to and receiving from [consumers] an amount in purported

---

[4] Plaintiffs filed a first amended complaint in August of 2007 that added Tower Energy Group as a Doe defendant. After Chevron filed a demurrer to the first amended complaint, plaintiffs filed their second amended complaint.

reimbursement for motor fuel taxes in excess of the amount of fuel taxes actually due and paid at the wholesale level"; (3) "[f]ailing to adjust the price of a 'gallon' of motor fuel sold to [consumers] when the temperature of such motor fuel exceeds 60 degrees Fahrenheit"; (4) concealing that retail motor fuel is ordinarily sold at a temperature substantially exceeding 60 degrees Fahrenheit; (5) concealing that the standard U.S. Petroleum Gallon in the motor fuel industry is 231 cubic inches at 60 degrees Fahrenheit; (6) concealing that the energy content of motor fuel sold at retail contains less energy than the standard U.S. Petroleum Gallon; and (7) concealing that the energy content of motor fuel sold at retail varies according to temperature and that the term "gallon" is not a standard unit of measure.

Plaintiffs' CLRA claim alleged that several of these same acts and omissions qualified as "misrepresentations as to the characteristics and quantities" of motor fuel, in violation of Civil Code section 1770, subdivision (a)(5).

Plaintiffs' UCL and CLRA claims sought numerous remedies, including damages, restitution and attorneys' fees. In addition, plaintiffs sought injunctive relief requiring Chevron to take various alternative acts, including, in part (1) installing ATC technologies on retail fuel pumps; (2) adjusting the price of motor fuel when the temperature of the fuel exceeds 60 degrees Fahrenheit; and (3) notifying consumers of the temperature at which motor fuel is sold and the effect of temperature on the energy content of motor fuel.

b. *Plaintiffs' claims for breach of contract and unjust enrichment*

Plaintiffs' breach of contract claim, which sought compensatory damages, alleged that consumers who purchased Chevron motor fuel reasonably understood that the advertised price of a "gallon" of motor fuel referred to U.S. Petroleum Gallons, rather than volumetric gallons that did not compensate for temperature. Chevron purportedly breached this term of its sales agreement by selling motor fuel in volumetric gallons that did not adjust for temperature variation.

Plaintiffs' fourth claim alleged that Chevron had been "unjustly enriched to the detriment of [consumers] on the sale of volumetric gallons of motor fuel in excess of 60 degrees Fahrenheit."

C. *Chevron's Demurrer to the Second Amended Complaint*

On April 11, 2008, Chevron filed a demurrer to the second amended complaint arguing that each of plaintiffs' claims failed "as a matter of law." First, Chevron argued that selling motor fuel in non-temperature-adjusted

gallon units did not violate the UCL or the CLRA because (1) California law requires or otherwise authorizes the sale of non-temperature-adjusted fuel at the retail level; (2) businesses are not required to "pass . . . on the benefits of, or disclose to, its retail customers the terms of its actual wholesale level transactions"; and (3) plaintiffs had failed to identify any statement or representation made by Chevron that could create an expectation among consumers that they would "receive . . . temperature-adjusted motor fuel."

Chevron's demurrer also argued that plaintiffs had failed to state a claim for breach of contract because consumers could not reasonably interpret the term "gallon" to mean "U.S. Petroleum Gallons" (231 cubic inches at 60 degrees Fahrenheit). Chevron asserted that California law specifically defined the word "gallon" to mean "231 cubic inches" without reference to temperature, and, as a result, consumers could not assign a meaning to the term that included a temperature component.

Chevron also argued that plaintiffs were prohibited from asserting a cause of action for unjust enrichment because other portions of their complaint alleged the existence of a valid contract. According to Chevron, unjust enrichment was a "quasi-contract theory" that was unavailable in cases where the " 'parties have an actual [contract] covering [a subject].' "

On May 30, 2008, the trial court issued an order overruling Chevron's demurrer to plaintiffs' claims for "unfair" and "fraudulent" business practices under section 17200 and their claim for violation of the CLRA. However, the trial court sustained Chevron's demurrer to plaintiffs' claims for unjust enrichment and "unlawful" business practices without leave to amend, and sustained Chevron's demurrer to the breach of contract claim with leave to amend.

The trial court concluded that plaintiffs had adequately stated a claim under section 17200's "unfairness" prong. The court explained that the "balancing test" applicable to "unfairness" claims was "not amenable to resolution at the pleading stage" and "should be determined on a developed factual basis." The court further explained that "a reasonable view is that the practice of measuring gas for purposes of paying the fuel taxes on a temperature adjusted basis, while selling gas in temperate climates on a non-temperature adjust basis (and collecting taxes thereon), is unfair and deceptive." It also concluded that "the practice of measuring gas at the wholesale level on a temperature adjusted basis, and failing to do so at the retail/consumer level where such conduct only benefits the seller, may prove to be inherently unfair and deceptive." In reaching its ruling, the court rejected Chevron's contention that California law required or implicitly authorized retailers to sell non-temperature-adjusted motor fuel at the retail level.

The court also ruled that plaintiffs had properly stated claims under section 17200's "fraudulent" prong and the CLRA. The court concluded that plaintiffs had "alleged facts which, if true, may reveal that members of the public had an 'expectation' or 'assumption' that the 'gallons' they were purchasing were temperature-adjusted gallons. As with the UCL 'unfair' claim, . . . the ultimate viability of the UCL 'fraudulent' claim should be [determined] on a factual basis." The court further explained that because the CLRA utilized the same standard that applied to claims arising under the fraudulent prong of the UCL, plaintiffs had properly stated a claim for violation of the CLRA.

However, the court ruled that plaintiffs had failed to state a claim under section 17200's "unlawful" prong. The court agreed with Chevron's assertion that selling retail motor fuel in volumetric gallons could not be deemed "unlawful" because California law required retail motor fuel to be sold in "gallons," and defined the term "gallon" to mean 231 cubic inches without reference to temperature. The court further ruled that Chevron's practice of paying government taxes based on the number of U.S. Petroleum Gallons purchased at wholesale, but collecting taxes from consumers based on the number of volumetric gallons sold at retail without reference to temperature, did not violate any statute or regulation, and therefore, was not "unlawful."

The court also ruled that plaintiffs had failed to state a claim for breach of contract or unjust enrichment. The court explained that, contrary to the allegations in plaintiffs' complaint, Chevron's use of the word "gallon" could not be reasonably interpreted as an offer to sell only "U.S. Petroleum Gallons" because (1) California law defined the term "gallon" as 231 cubic inches without reference to temperature, and this definition was, by operation of law, implied into every sales contract, and (2) a consumer would have "no basis on which to assume an 'industry standard' as a term of his or contract to purchase."

In regard to plaintiffs' unjust enrichment claim, the court ruled that, " 'as a matter of law, a quasi-contract action for unjust enrichment does not lie where . . . express binding agreements exist and define the parties' rights.' " The court concluded that because plaintiffs had "alleg[ed] that agreements exist defining the parties' rights," they could not pursue a claim for unjust enrichment.[5]

---

[5] Although the court determined that plaintiffs had stated viable claims under the UCL and CLRA, it elected to temporarily stay the action under the doctrine of primary jurisdiction. (See *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 558–559, fn. 5 [53 Cal.Rptr.2d 878] (*Wolfe*) [where a claim requires "resolution of issues which . . . have been placed within the special competence of an administrative body," the primary jurisdiction doctrine permits courts to suspend "judicial process . . . pending referral of those issues to the administrative body for its view"].) The court concluded that the CDFA and the CEC should be

### D. *Plaintiffs' Third Amended Complaint*

After the trial court issued its ruling on Chevron's demurrer, plaintiffs filed a third amended complaint that made several changes to its breach of contract claim. First, plaintiffs added allegations explaining why consumers reasonably interpreted the term "gallon" in Chevron's retail motor fuel advertisements to mean U.S. Petroleum Gallons, rather than volumetric gallons without reference to temperature. Second, plaintiffs added allegations asserting that, because Chevron retail outlets displayed the statement " '$ price per gallon including taxes,' " consumers understood "a material term of that [sales] agreement was that . . . the Defendant was in essence collecting reimbursement for taxes actually paid on each gallon so purchased." Chevron allegedly breached that term "by charging [consumers] for purported taxes which they in fact retained."

On August 4, 2008, Chevron filed a demurrer to the third amended complaint arguing that plaintiffs had still failed to state a claim for breach of contract because (1) the amended complaint did not address the fact that California law defines the term "gallon" to mean 231 cubic inches without reference to temperature, and (2) the phrase "$ price per gallon including taxes" could not be reasonably interpreted as creating any contractual duty regarding the payment of taxes to government entities. Chevron also renewed its demurrer to the remaining portion of plaintiffs' UCL claim and their CLRA claim, which had not been amended in the third amended complaint.

The trial court sustained Chevron's demurrer to the breach of contract claim without leave to amend, but overruled the demurrer on plaintiffs' remaining UCL and CLRA claims. On plaintiffs' breach of contract claim, the trial court agreed with Chevron that (1) consumers could not reasonably interpret the term "gallon" as referencing U.S. Petroleum Gallons, and (2) the phrase "$ price per gallon including taxes" could not be reasonably interpreted as a contractual obligation requiring Chevron to remit all tax revenues to government authorities.

On the UCL and CLRA claims, the court ruled that Chevron had merely reasserted the same arguments set forth in its demurrer to plaintiffs' second amended complaint, which the court had already rejected.

allowed to "opine on the practice of selling gallons of gas in 'volumetric' terms, without regard to the effect heat has on the change in the amount of gas actually purchased." After receiving a copy of the court's order, the CDFA and CEC issued a letter stating that, until they completed the cost-benefit analysis mandated under section 13630, they would remain "neutral regarding the issue of whether fuels sold at retail should be measured without reference to the effect of temperature on that fuel."

E. *CEC Cost-benefit Analysis and Chevron's Motion for Judgment on the Pleadings*

1. *Summary of the CEC cost-benefit analysis*

In March 2009, the CEC, in compliance with section 13630, issued the final version of its cost-benefit analysis regarding "the implementation of Automatic Temperature Compensation devices at retail service stations." The CEC concluded that if ATC technologies had been in place at retail gas stations during the one-year study period, Californians would have purchased "about 117 million gallons less compared to status quo (no ATC at retail outlets) because the fuel was warmer (71.1 degrees Fahrenheit) than the 60 degree Fahrenheit reference standard." The study further concluded that "[i]f ATC were mandated for use at retail stations, consumers would be able to more accurately and fairly compare prices because variations in temperature would be corrected by the ATC equipment."

The CEC noted, however, that if ATC technology was mandated by law, distributors would "most likely raise their fuel prices to compensate for selling fewer [temperature-adjusted] 'gallons'" and to cover "ATC retrofit costs." Thus, the "expected benefits for retail motorists w[ould] be essentially zero" and likely result in "a net cost for consumers."

The CEC's analysis included a series of recommendations regarding the implementation of ATC technology, which stated, in relevant part: (1) "If the *only criterion* for assessing the merit of mandatory ATC installations for use at California retail stations is a net benefit to consumers, the [CEC] concludes that ATCs should not be required since the results of the cost-benefit analysis show a net cost for consumers"; (2) "However, the [CEC] recommends that the Legislature also consider whether the possible value of increased fairness, accuracy, and consistency of fuel measurement, in addition to the benefits quantified in the cost-benefit analysis, justify mandating ATC at California retails stations"; (3) "If the Legislature chooses to permit or mandate ATC at retail, they should direct the California Division of Measurement Standards to develop standards addressing equipment approval, certification testing, compliance enforcement, and consumer labeling provisions for ATC at retail stations."

The CEC also recommended "supplement[ing] the cost-benefit analysis" by conducting further research in two areas: (1) estimating "[t]he possible value of increased fairness, accuracy, and consistency benefits of ATC to consumers . . . through focus groups and survey methods that assess consumers' willingness to pay for such benefits" and (2) refining "[t]he value of increased price transparency associated with ATC . . . through further research on the fuel temperature variation[s] between adjacent retail stations."

### 2. Chevron's motion for judgment on the pleadings

#### a. Summary of Chevron's motion for judgment on the pleadings

On April 19, 2009, Chevron filed a motion for judgment on the pleadings arguing that, in light of the CEC's cost-benefit analysis, the trial court should dismiss plaintiffs' remaining claims under the judicial abstention doctrine. Chevron argued that CEC's analysis demonstrated that further adjudication of plaintiffs' claims would require the court to "consider the same economic analysis and, ultimately, make findings which either confirm or contradict the CEC's findings" that selling temperature-adjusted fuel at retail in California would result in a net cost to consumers. According to Chevron, "[a]ny such findings by this Court necessarily delve into, and thereby risk undermining, the complex economic analysis which the Legislature directed the CEC to perform." Chevron argued that the CEC report also showed that requiring retailers to disclose the effects of temperature increases on motor fuel could lead to conflicts with future directives from state agencies. In support, Chevron noted that, when presenting the results of the CEC cost-benefit analysis at a public hearing, California officials testified that, prior to implementing ATC technology, agencies would need to adopt "specific requirements for method of sale, advertising and device specifications." Thus, according to Chevron, "making findings relating to the adequacy of Chevron's disclosures in its price signs and dispenser labels . . . [would] risk[] contradicting the judgments and policy decision of expert regulators in this arena."

Chevron contended that, overall, the CEC report demonstrated that "any change to the historical practice of selling retail motor fuel in California must be systemic and guided by expert agencies." Moreover, adjudicating plaintiffs' claims would necessarily "place[] [the court] in the position of having to either anticipate what the legislature or regulators will do in this arena, or issuing directives to a single retailer which may be subsequently contradicted by these rulemaking agencies."

In their opposition, plaintiffs argued that it would be improper for the court to abstain from adjudicating its UCL and CLRA claims based solely on a report that did not establish any law or create any scheme for regulating the sale of non-temperature-adjusted gasoline at retail. Plaintiffs also argued that the report only addressed one potential remedy referenced in the third amended complaint: whether the Legislature should require the use of ATC equipment on retail motor fuel pumps in California. According to plaintiffs, the report did not analyze or consider numerous other issues raised in the lawsuit including (1) whether Chevron should be required to adjust motor

fuel temperature based on means other than ATC technology; (2) whether Chevron should be required to make disclosures regarding the effect of temperature on motor fuel; and (3) whether Chevron's practice of collecting more motor fuel taxes from consumers than it pays to the government violated California law.

> b. *Summary of trial court's ruling on Chevron's motion for judgment on the pleadings*

On July 2, 2009, the trial court entered a written order ruling that Chevron had demonstrated that "the CEC Report . . . justifies the Court invoking the equitable abstention doctrine with respect to [plaintiffs'] remaining . . . claims."[6] The court provided three reasons in support of its decision.

First, the court concluded that the CEC report was "likely the [Legislature's] first step in determining whether regulating the sale, marketing and advertising of 'hot' fuel is appropriate." "[I]f and when the Legislature does decide to act further, such action will directly impact the claims in this litigation." The court expressed concern that "granting . . . the injunctive relief requested by Plaintiff would impose this Court's views over those of the [Division of Measurement Standards] and the Legislature" and involve the court "in areas of complex economic policy . . . that are clearly being addressed by the regulatory agencies and the legislature."

Second, the court explained that "equitable abstention is appropriate where injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more [effective] means of redress (in this case, through the Legislature, CEC, and DMS). The Court's monitoring burden would be heavy, in light of the report's recommendations."

Third, the court ruled that adjudicating plaintiffs' "tax-related disclosure claims" would interfere with "a comprehensive scheme of tax collection for motor fuel."

---

[6] The trial court took judicial notice of the CEC report pursuant to Evidence Code section 452, subdivision (c), but clarified that it was only taking notice of the existence of the report, and not the "the truth of the matters stated" within the report. (See *Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518 [104 Cal.Rptr.2d 439] [Evid. Code, § 452, subd. (c) permits judicial notice of "records, reports and orders of administrative agencies"]; *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73] ["While courts may notice official acts and public records, 'we do not take judicial notice of the truth of all matters stated therein.' [Citations.]"], overruled on another ground in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276 [63 Cal.Rptr.3d 418, 163 P.3d 106].) We do the same. (See Evid. Code, § 459, subd. (a) ["The reviewing court shall take judicial notice of . . . each matter properly noticed by the trial court . . . ."]; *Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 971 [103 Cal.Rptr.3d 383] [when reviewing demurrer or judgment on the pleadings, appellate courts may "consider matters subject to judicial notice"].)

The court thereafter entered a judgment dismissing plaintiffs' remaining UCL and CLRA claims. Plaintiffs filed a timely appeal of the trial court's judgment and its prior orders on Chevron's demurrers.

## DISCUSSION

On appeal, plaintiffs argue that the trial court abused its discretion in granting Chevron's motion for judgment on the pleadings under the judicial abstention doctrine. In addition, plaintiffs assert that the trial court erred in sustaining Chevron's demurrer to their claims for "unlawful" business practices under the UCL, breach of contract and unjust enrichment.

Chevron, however, contends that we should affirm the trial court's order granting judgment on the pleadings and the court's prior orders sustaining Chevron's demurrers to the remainder of plaintiffs' claims. Alternatively, Chevron argues that, if we reverse the trial court's order granting judgment on the pleadings, we should also reverse the trial court's orders overruling Chevron's prior demurrers to plaintiffs' claims for "unfair" and "fraudulent" business practices under the UCL and violation of the CLRA.

### A. The Trial Court Erred in Dismissing Plaintiffs' UCL and CLRA Claims Pursuant to the Judicial Abstention Doctrine

We first consider whether the trial court erred in granting Chevron's motion for judgment on the pleadings pursuant to the judicial abstention doctrine. "In an appeal from a motion granting judgment on the pleadings, we accept as true the facts alleged in the complaint and review the legal issues de novo. 'A motion for judgment on the pleadings, like a general demurrer, tests the allegations of the complaint or cross-complaint, supplemented by any matter of which the trial court takes judicial notice, to determine whether plaintiff or cross-complainant has stated a cause of action. [Citation.]" (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166 [59 Cal.Rptr.3d 142, 158 P.3d 718].) " 'We consider evidence outside the pleadings which the trial court considered without objection. [Citation.]' [Citation.]" (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1065 [20 Cal.Rptr.3d 562].)

"In cases where the trial court dismisses a cause of action based on the doctrine of judicial abstention, the standard of review is abuse of discretion. [Citations.]" (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 [104 Cal.Rptr.3d 545] (*Arce*).) "A trial court's decision that rests on an error of law is an abuse of discretion." (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939 [124 Cal.Rptr.3d 565].)

1. *Summary of the judicial abstention doctrine and relevant case law*

■ "As a general matter, a trial court may abstain from adjudicating a suit that seeks equitable remedies if 'granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency.' [Citation.] A court also may abstain when 'the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency.' [Citation.] In addition, judicial abstention may be appropriate in cases where 'granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress.' [Citation.]" (*Arce, supra*, 181 Cal.App.4th at p. 496.)

The judicial abstention doctrine—which is also referred to as the equitable abstention doctrine—has been applied in numerous cases arising under the UCL. For example, in *Wolfe, supra*, 46 Cal.App.4th 554, the plaintiff filed a suit alleging that several property insurers had violated section 17200 by electing not to issue any new residential policies following a 1994 earthquake that caused approximately $11 billion in property damage. At the time the suit was filed, California law required insurers that sold residential home-owner policies to offer earthquake-related coverage. After the 1994 earthquake, many "insurers decided to stop or reduce their sales of homeowners insurance in order to avoid writing new earthquake policies." (46 Cal.App.4th at p. 557.) The plaintiffs alleged that the insurers' refusal to issue new policies made it difficult for "prospective homebuyers . . . to procure financing" and "squeeze[ed] some buyers out of the market due to rising interest rates and the concomitant effect on the buyers' ability to qualify for home loans." (*Id.* at p. 558.) The trial court sustained a demurrer to the complaint under the judicial abstention doctrine.

The appellate court affirmed the ruling based on two factors. First, the court explained that adjudicating the plaintiff's claims would require the court to "interven[e] in an area of complex economic policy." (*Wolfe, supra*, 46 Cal.App.4th at p. 565.) Specifically, the court concluded that determining whether insurers had acted fairly in electing not to offer new residential policies would "necessarily involve the court in evaluating the potential risk being undertaken by each individual homeowners/earthquake insurer and analyzing their respective financial conditions to determine whether they would remain sufficiently solvent to undertake those risks." (*Id.* at p. 567.)

Second, the court cited the fact that, following the 1994 earthquake, the Legislature had passed two bills that attempted to address "the earthquake insurance availability problem." (*Wolfe, supra*, 46 Cal.App.4th at p. 565.) The

first bill, Assembly Bill No. 1366 (1995–1996 Reg. Sess.), "substantially reduced the minimum earthquake coverage which residential real property insurers were obligated to offer . . . when selling homeowners insurance." (46 Cal.App.4th at p. 565.) According to the author of the bill, the legislation was intended " 'to induce more insurers to return to active writing of homeowners and earthquake insurance.' " (*Id.* at p. 566.)

The second bill, Assembly Bill No. 13 (1995–1996 Reg. Sess.), established the California Earthquake Authority (CEA), which was authorized to sell basic earthquake insurance in California. Assembly Bill No. 13 (1995–1996 Reg. Sess.) further directed that the CEA was to (1) " ' "identify at least two alternatives to the California Earthquake Authority concept that address the problem of earthquake insurance and the unavailability of homeowners' insurance," ' " and (2) " ' "establish an earthquake insurance advisory committee with consumer and other representatives to identify and consider alternative solutions." ' " (*Wolfe, supra*, 46 Cal.App.4th at p. 566.)

The appellate court concluded that abstention was appropriate because Assembly Bill No. 1366 (1995–1996 Reg. Sess.) and Assembly Bill No. 3 (1995–1996 Reg. Sess.) demonstrated that "[t]he Legislature ha[d] . . . not only enacted certain measures to address the problems which gave rise to appellant's complaint, [but] . . . also made clear its intent to consider other measures as well." (*Wolfe, supra*, 46 Cal.App.4th at p. 567.) The court further explained that it "need not consider the wisdom or efficacy of [the Legislature's acts] or any other future legislation in regard to the earthquake insurance problem. It is enough that the Legislature has tried and will try again to address the problem. . . . The Legislature's expressed intent to address these issues, both now and in the future, mandates judicial restraint . . . ." (*Id.* at p. 568.)

The appellate court reached a similar conclusion in *Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621 [39 Cal.Rptr.3d 62] (*Shamsian*). The plaintiff in *Shamsian* filed a complaint alleging that two corporate defendants, Anheuser-Busch, Inc., and Miller Brewing Company had violated the UCL by failing to fulfill their duties under the California Beverage Container Recycling and Litter Reduction Act, Public Resources Code section 14500 et seq. (the recycling act). The plaintiff's claim was predicated on Public Resources Code section 14501, subdivision (g), which states that " '[t]he responsibility to provide convenient, efficient, and economical redemption opportunities rests jointly with manufacturers, distributors, dealers, recyclers, processors, and the Department of Conservation.' " (136 Cal.App.4th at p. 633.) The plaintiff contended that, by failing to provide sufficient redemption opportunities, defendants had caused "an unacceptably low recycling rate." (*Shamsian, supra*, 136 Cal.App.4th at p. 641.) The trial

court sustained a demurrer to the complaint, ruling that "equitable abstention was appropriate in light of the comprehensive administrative scheme created to address beverage container recycling." (*Id.* at p. 631.)

The appellate court began its analysis by summarizing the recycling act, which "create[d] a comprehensive administrative scheme designed to encourage and facilitate the large-scale recycling of used beverage containers" and "achieve stated recycling goals through a complex arrangement of financial incentives." (*Shamsian, supra,* 136 Cal.App.4th at pp. 626–627.) The court noted that the act authorized the Department of Conservation to administer the program and to enforce its mandates through the imposition of civil penalties and other disciplinary actions.

The court concluded that abstention was proper based on the fact that the Legislature had established a regulatory framework that was intended to address the same issues the plaintiff had raised in his complaint: "the complex statutory arrangement of requirements and incentives involving participants in the beverage container recycling scheme is to be administered and enforced by the department consistent with the Legislature's goals. For the court at this point to issue restitution and disgorgement orders against the corporate defendants would interfere with the department's administration of the act and regulation of beverage container recycling and potentially risk throwing the entire complex economic arrangement out of balance. The public's need for opportunities to recover its cash redemption value funds and to conveniently recycle its beverage containers is not so great as to warrant judicial interference in the administrative scheme designed to address those needs at this point." (*Shamsian, supra,* 136 Cal.App.4th at p. 642.)

In *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292 [64 Cal.Rptr.3d 250] (*Alvarado*), the plaintiff brought a class action lawsuit seeking injunctive relief under the UCL that would require approximately 20 different nursing facilities "to comply with certain nursing hour requirements set forth in Health and Safety Code section 1276.5, subdivision (a)." (153 Cal.App.4th at p. 1295.) The trial court "exercise[d] its discretion to abstain from adjudicating the case" and sustained a demurrer without leave to amend. (*Id.* at p. 1296.) The appellate court affirmed, explaining that (1) adjudicating the plaintiff's claims would require the trial court to make a series of complex factual findings regarding each defendant, and (2) the Legislature had directed the State Department of Health Care Services to enforce the statute.

The appellate court began by describing the numerous factual findings and calculations the trial court would be required to make in determining whether each defendant had violated Health and Safety Code section 1276.5. First, the court would have to determine whether a particular facility qualified as a

"skilled nursing facility" within the meaning of section 1276.5, and, if so, whether the facility qualified for any of the exceptions listed in the statute. (*Alvarado, supra*, 153 Cal.App.4th at p. 1305.) Second, to the extent the court found that a facility fell within the statutory requirements, it would then have to (a) classify every employee of the facility into one of eight statutorily enumerated categories; (b) calculate the hours worked by each employee that fell into a qualifying classification; and (c) determine the size, configuration and licensing statute of the skilled nursing facility. Moreover, the court would have to perform these tasks for every facility named in the complaint (which totaled over 20) and "manage the long-term monitoring process to ensure compliance with [the statute]." (*Id.* at p. 1306.)

The court further explained that the statutory framework demonstrated that the Legislature intended the State Department of Health Care Services to enforce Health and Safety Code section 1276.5, which was "better equipped to determine compliance with the statute." (*Alvarado, supra*, 153 Cal.App.4th at p. 1305.) The court concluded that "DHCS ha[d] the power, expertise and statutory mandate to regulate and enforce section 1276.5. Given this alternative and more effective means of ensuring compliance with [the statute], . . . the trial court did not abuse its discretion by applying the abstention doctrine." (*Id.* at p. 1306.) The court further noted, however, that its ruling did not leave the plaintiff without a remedy because he was free to pursue a writ of mandate compelling the State Department of Health Care Services to comply with its duty to enforce Health and Safety Code section 1276.5.

The judicial abstention doctrine has also been employed outside the context of the UCL. In *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349 [83 Cal.Rptr.3d 588] (*Biological Diversity*), the plaintiffs alleged that the operators of wind turbine electric generators located in Alameda and Contra Costa Counties were, "by the operation of their wind turbines, responsible for killing and injuring raptors and other birds in violation of the public trust doctrine." (*Id.* at p. 1354.) The trial court dismissed the plaintiffs' claim on the ground that the public trust doctrine did not provide "a cause of action by a private party . . . arising from the destruction of wild animals." (*Id.* at p. 1356.)

Although the appellate court ruled that the trial court erred in concluding that the public trust doctrine did not apply to the destruction of wildlife, it upheld the dismissal of the case under the judicial abstention doctrine. The court noted that, at the time the plaintiffs filed their complaint, "administrative proceedings were underway in Alameda County in which consideration was being given to applications to extend . . . the . . . conditional use permits to operate the wind turbines . . . ." (*Biological Diversity, supra*, 166 Cal.App.4th at p. 1356.) During these proceedings, the county established a

" 'Wind Power Working Group' " that was intended to " 'assist the County in addressing operational issues and identifying appropriate measures to reduce avian mortality.' " (*Id.* at pp. 1356–1357.) The county eventually granted "the conditional use permits subject to nine new conditions on wind turbine use aimed at mitigating avian mortality." (*Id.* at p. 1357.)

The appellate court concluded that, regardless of whether the plaintiffs were permitted to bring a cause of action against the turbine operators for violating the public trust doctrine, "it would be appropriate for the court to abstain from adjudicating it in deference to the regulatory oversight being provided by public authorities." (*Biological Diversity, supra,* 166 Cal.App.4th at p. 1371.) The court explained that the "specification of conditions best designed to accommodate the conflicting environmental and energy concerns presented by the operation of wind turbines is both highly complex and value laden. . . . [¶] Intervention by the courts, other than by exercising oversight over the administrative process and ensuring that proper standards are applied, not only would threaten duplication of effort and inconsistency of results, but would require the courts to perform an ongoing regulatory role as technology evolves and conditions change." (*Ibid.*)

As in *Alvarado,* the court emphasized that its ruling did not leave the plaintiffs without a remedy: "We do not gainsay plaintiffs' concern for the protection of the raptors and other birds that are suffering . . . from the operation of the wind turbines . . . . However, it is apparent that the responsible public agencies have not ignored this concern and are attempting to mitigate the harm to birdlife by imposing appropriate conditions and restrictions on the operation of the turbines. We are in no position at this time and on this record to pass judgment on the sufficiency of those efforts or to express any opinion as to whether the public trust over these natural resources is being adequately enforced. What we do say is that any challenge to the adequacy of the measures being taken must be addressed in an appropriate manner to the agencies that are responsible for regulating those activities. The courts are available to review the responses of those agencies, but they are not available to supersede their role in the regulatory process." (*Biological Diversity, supra,* 166 Cal.App.4th at p. 1372.)

In each of the cases above, the appellate court ruled that judicial abstention was appropriate based on the presence of two factors. First, the plaintiffs had asserted claims that would necessarily require the trial court to resolve complex policy issues. Second, there was an alternative mechanism for resolving the issues the plaintiffs had raised in their complaints.

It is this analytic framework that serves as the basis for our review of the trial court's invocation of the judicial abstention doctrine.

2. *The trial court abused its discretion in employing the judicial abstention doctrine*

The trial court's decision to abstain from adjudicating plaintiffs' claims was predicated on the CEC report, which examined whether the implementation of ATC technology would result in a net economic benefit to consumers. The trial court concluded that the statutorily mandated report was "likely the first step in determining whether regulating the sale [of non-temperature-adjusted] fuel is appropriate." The court explained that if plaintiffs' case were to proceed, it would "become involved in areas of complex economic policy . . . that are clearly being addressed by the regulatory agencies and the legislature." The court also expressed concerns that the CEC report demonstrated that the injunctive relief sought by plaintiffs would be "unnecessarily burdensome for the trial court to monitor and enforce . . . ."[7]

a. *At this stage in the proceedings, it is not clear that adjudicating plaintiffs' claims will require the court to resolve complex policy issues*

Under the analytic framework discussed above, the first question we must consider is whether adjudicating plaintiffs' UCL and CLRA claims would " ' "drag [the trial court] . . . into an area of complex economic [or similar] policy." ' " (*Biological Diversity, supra,* 166 Cal.App.4th at p. 1371.) Chevron argues that the CEC report demonstrates that "determining whether motor fuel should be sold throughout some or all of California on a temperature-adjusted basis implicates complex economic policy decisions, as well as a host of complex technical issues best left to the judgment of the Legislature and expert state regulators." Chevron further contends that granting relief in this case would "necessarily compel substantial changes to the way that motor fuel is sold at retail throughout California." The trial court agreed, explaining that "adjudication of the issues raised in the [Complaint]" would inject the court "into the process of determining the appropriate method of . . . dispensing motor fuels" throughout California.

---

[7] The trial court also stated that adjudicating plaintiffs' "tax-based" claim would interfere with "a comprehensive scheme of tax collection for motor fuel." Although the parties' appellate briefs contain limited discussion of this particular basis for abstention, we agree with plaintiffs' contention that the court's ruling misconstrues the nature of their "tax-based" claim. The complaint makes clear that plaintiffs are not seeking a "tax refund" or "attempt[ing] to change how taxes are collected by the government." Rather, they allege only that Chevron should not be permitted to charge consumers more in purported motor fuel taxes than it is required to pay to the government. As explained in plaintiffs' brief, prohibiting Chevron from engaging in such conduct would have no affect on the government's ability to "impos[e] or collect[] . . . taxes" nor would it interfere with the government's enforcement of relevant tax laws.

Chevron's arguments are predicated on the assumption that the only possible form of relief in this case is a court order mandating that Chevron offer its retail consumers temperature-adjusted motor fuel through the implementation of ATC technology or other similar technologies. Plaintiffs' complaint, however, seeks other relief, including a disclosure requirement that, if granted, might not require substantial changes to the way Chevron currently sells motor fuel at the retail level.

Although plaintiffs' UCL and CLRA claims assert that Chevron's failure to compensate for temperature variation in retail motor fuel is an unfair and deceptive business practice, they also allege that Chevron's failure to disclose that it does not compensate for temperature variation is both unfair and deceptive. Plaintiffs' prayer for relief, in turn, seeks alternative remedies that reflect these separate claims. First, plaintiffs request an injunction requiring the implementation of ATC technology. Alternatively, they request an injunction requiring Chevron to notify "consumers of the temperature at which the [retail] motor fuel is being sold and the effect of temperature on the energy content of motor fuel." Presumably, drafting and implementing such disclosures would entail few (if any) of the complexities associated with enforcing an injunction requiring the adoption of ATC technology.[8]

Based on the trial court's order, it does not appear that it considered whether requiring Chevron to make disclosures regarding the effect of temperature on motor fuel, as opposed to actually requiring it to sell temperature-adjusted fuel, would implicate any complex issue of economic policy. The fact that plaintiffs' claims might be resolved by merely requiring Chevron to disclose certain information to its consumers differentiates this case from prior decisions in which our courts have endorsed the use of the abstention doctrine.[9]

---

[8] Chevron argues that the CEC report suggests that even a disclosure remedy would require the resolution of "complex regulatory policy issues." In support, it cites portions of the report explaining that, prior to implementing ATC technology, the Division of Measurement Standards would have to decide what changes, if any, should be made to fuel dispenser labels and retail station displays to "convey[] ATC information" to consumers. These comments describe disclosures that would be necessary only in the event that the Legislature elected to implement ATC technology. As explained above, however, plaintiffs have sought disclosure remedies that are unrelated to the implementation of ATC technology. Such disclosures would, in effect, provide consumers information about the temperature of retail motor fuel and the effect of temperature on retail motor fuel. Nothing in the CEC report suggests that implementing such disclosures involves the resolution of complex economic policies.

[9] We further note that if the trial court ultimately determined that Chevron had committed an unfair or deceptive business practice, it would have " 'very broad' " discretion to formulate an appropriate remedy. (*Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1277 [62 Cal.Rptr.3d 284] (*Benson*) ["[a] trial court has 'very broad' discretion in formulating equitable relief in unfair competition law actions"].) At the pleadings stage, it would be improper for us

### b. *There is no existing, alternative means of addressing plaintiffs' claims*

The second factor we must consider in analyzing the applicability of the judicial abstention doctrine is whether the Legislature or other government entity has attempted to remedy the issues raised in plaintiffs' complaint or provided an alternative means of addressing such issues. To date, the only action the Legislature has taken in regard to the sale of non-temperature-adjusted fuel is adopting a statute directing the CEC to conduct a cost-benefit analysis of implementing ATC fuel pumps at retail stations. The resulting report does not actually address the practice of selling non-temperature-adjusted motor fuel at retail nor does it empower any entity to address the issue. Instead, the report merely provides information about one possible solution to the problem.

 The fact that the Legislature has required an agency to investigate remedies to a potentially problematic business practice is not, standing alone, sufficient to support judicial abstention. (See *Arce, supra*, 181 Cal.App.4th at p. 502 ["the fact that an administrative agency may, at some future time, adopt new regulations bearing on pending legal issues does not mean that a court should abstain from adjudicating [the] controversy"].) Rather, the cases summarized above make clear that abstention is generally appropriate only if there is an alternative means of resolving the issues raised in the plaintiff's complaint: in *Wolfe*, the Legislature passed multiple laws that were intended to resolve "the earthquake insurance availability problem" (*Wolfe, supra*, 46 Cal.App.4th at p. 565); in *Shamsian*, the Legislature authorized the Department of Conservation to administer and enforce a complex recycling scheme that was designed to address the public's need to "conveniently recycle its beverage containers" (*Shamsian, supra*, 136 Cal.App.4th at p. 642); in *Alvarado*, the Legislature mandated that the State Department of Health Care Services enforce Health and Safety Code section 1275's nursing hour requirements; in *Biological Diversity*, local authorities who were responsible for approving the defendants' wind turbine permits were "attempting to mitigate the harm to birdlife by imposing appropriate conditions and restrictions on the operation of the turbines." (*Biological Diversity, supra*, 166 Cal.App.4th at p. 1372.)[10]

---

to presume that the only possible means of addressing plaintiffs' claims would be to impose ATC technology. Based on the evidence developed at trial, the trial court might well conclude that other options exist.

[10] Courts generally look to acts of the Legislature when determining whether plaintiffs have been provided an adequate alternative mechanism to address their claims. In some instances, however, actions by other government entities, including local governments, may be sufficient to support abstention. (See *Biological Diversity, supra*, 166 Cal.App.4th at p. 1372 [abstaining from claim alleging that defendants' wind turbines violated the public trust doctrines because county government was addressing the claims in crafting a permit for the turbines].) In this

Here, however, no government entity has attempted to resolve potential harms caused by the sale of non-temperature-adjusted fuel at the retail level or otherwise established an alternative mechanism for addressing those harms. Therefore, to abstain from deciding the issues plaintiffs have raised in their complaint means that those issues will remain unresolved unless the Legislature decides to intervene, which may never occur.

■ Chevron disagrees, asserting that abstention is appropriate in this case because the CEC report demonstrates that the Legislature "has . . . an intent to address the issues raised in plaintiffs' lawsuit." According to Chevron, abstention is not limited to situations in which the Legislature has actually provided an alternative means of addressing a plaintiff's claims; rather, the doctrine may be applied whenever there is "evidence of [an] intent to regulate within a certain area. Nothing more is required." Even if we accept Chevron's contention that the passage of section 13630 (which mandated that CEC prepare a cost-benefit analysis) qualifies as evidence that the Legislature intends to address the sale of non-temperature-adjusted motor fuel at a future date, this division recently clarified in *Arce, supra,* 181 Cal.App.4th 471 that a future intent to regulate is not sufficient to invoke abstention.

The plaintiffs in *Arce* alleged that a health insurance provider had violated section 17200 by categorically denying "behavioral therapy and speech therapy to plan members with autism spectrum disorders." (*Arce, supra,* 181 Cal.App.4th at p. 478.) The defendants argued that the court should abstain from deciding the issue because the Department of Managed Health Care (DMHC) had released a memorandum stating that it intended to " 'initiate the rulemaking process to formalize plan requirements' " for the treatment of autism and to " 'provide additional clarity through an open and public process.' " (*Id.* at p. 502.) The defendants contended that abstention was necessary to "allow the DMHC the time to perform its regulatory functions and to develop further regulations to address the specific issues raised by this suit." (*Ibid.*) We rejected the argument, stating "the fact that an administrative agency may, at some future time, adopt new regulations bearing on pending legal issues does not mean that a court should abstain from adjudicating a presently justiciable controversy." (*Ibid.*)

This case presents an even weaker case for abstention. In *Arce,* the DMHC indicated that it actually intended to address the issues raised in the plaintiffs' complaint. In contrast, the CEC report does not include any statements suggesting that a government entity intends to address whether it is proper to sell non-temperature-adjusted fuel at the retail level. The report merely

___

case, we need not determine what other types of nonjudicial remedies might properly support abstention because Chevron has failed to identify any existing mechanism that could be used to resolve plaintiffs' claims.

provides a cost-benefit analysis of one potential remedy to the problem. If an agency's express statement that it intends to address an issue is insufficient to support abstention, an agency report that does nothing more than convey research on an issue is clearly not a proper basis for abstaining.

Chevron also appears to contend that judicial abstention is appropriate whenever a plaintiff has asserted claims involving complex policy issues that the Legislature (or other government entity) has the authority to address. In other words, Chevron asserts that abstention is appropriate because, regardless of whether the Legislature has made any attempt to address the sale of non-temperature-adjusted fuel, it has the authority to do so. Again, our holding in *Arce* forecloses that argument, clarifying that "the fact that [a government entity] may . . . [take actions that] . . . bear[] on pending legal issues does not mean that a court should abstain from adjudicating a presently justiciable controversy." (*Arce, supra*, 181 Cal.App.4th at p. 502.)[11]

■  In sum, neither of the factors that supported abstention in *Wolfe*, *Shamsian*, *Alvarado* or *Biological Diversity* are present here. Contrary to Chevron's assertion, it is not clear at this stage of the proceedings that plaintiffs' claims will necessarily require the court to enter into complex areas of economic policy. Moreover, the Legislature has not provided any alternative means of addressing the issues raised in plaintiffs' claims, nor has it provided any certainty that it will address those issues in the future. Abstention would therefore leave plaintiffs without a remedy.

---

[11] It is true that courts have concluded that the UCL may not be used to challenge certain forms of conduct that involve "matters of complex economic policy entrusted to the Legislature." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 43 [77 Cal.Rptr.2d 709, 960 P.2d 513] [UCL does not impose a "duty [on insurers] to do business with or issue a policy of insurance to any applicant for insurance. Whether an insurer should be required to offer a particular class of insurance or insure particular risks are matters of complex economic policy entrusted to the Legislature."]; see also *Korens v. R. W. Zukin Corp.* (1989) 212 Cal.App.3d 1054 [261 Cal.Rptr. 137] [UCL did not impose duty requiring landlord to pay interest on security deposit]; *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1160–1161 [93 Cal.Rptr.2d 439] [UCL does not empower courts " 'to engage in complex economic regulation under the guise of judicial decisionmaking' "].) However, in those cases, the courts did not in fact abstain from adjudicating the UCL claim. Instead, by concluding that the UCL either did not apply to the particular conduct at issue or did not permit the type of relief the plaintiff was seeking, they actually decided the claim presented. To the extent other opinions suggest that abstention is appropriate based solely on the fact that a claim presents issues of complex policy that the Legislature has the authority to address, we respectfully disagree. (Cf. *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 794–796 [114 Cal.Rptr.2d 623].)

c. *Chevron's alternative arguments do not compel a different outcome*

Chevron raises two alternative grounds for affirming the trial court's decision to abstain from deciding plaintiffs' UCL and CLRA claims. First, Chevron contends that the trial court acted within its discretion when it ruled that any injunctive relief in this case would be "unnecessarily burdensome for the trial court to monitor and enforce given the availability of more [effective] means of redress (in this case, through the Legislature, CEC, and DMS.)" Second, Chevron contends that adjudicating plaintiffs' claims would interfere with the functions of an administrative agency because it would require the court to revisit the conclusions in the CEC report. Both arguments lack merit.

"[J]udicial abstention may be appropriate in cases where 'granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress.' [Citation.]" (*Arce, supra,* 181 Cal.App.4th at p. 496.) Here, the trial court found that recommendations listed in the CEC report demonstrated that an injunction requiring the implementation of ATC technology would be extremely burdensome for the court to administer and enforce. In support, the court referenced portions of the report advising the Legislature that, prior to implementing ATC technology, it would have to decide how to phase-in the requirement and "develop standards addressing equipment approval, certification testing, compliance enforcement, and consumer labeling provisions for ATC at retail stations."

Requiring the implementation of ATC technology might entail significant burdens that a court is not well equipped to manage. However, as we explained above, that is not the only form of relief plaintiffs have requested nor is it the only possible remedy in this case.

Chevron also argues that abstention is appropriate to avoid interference with the functions of an administrative agency. Specifically, Chevron contends that "adjudication of any of plaintiffs' claims would require the Superior Court to undertake the same economic analysis and, ultimately, to make findings which either confirm or contradict the CEC's findings." Even if we assume the trial court would somehow interfere with the CEC's functions by conducting an independent analysis of some of the issues considered in the CEC report, Chevron overlooks the fact that the report does not address many of the issues plaintiffs have raised in their complaint.

The CEC made clear that its report was limited to "conduct[ing] a cost-benefit analysis and mak[ing] recommendations relative to the implementation of Automatic Temperature Compensation devices at retail service

stations." The CEC also clarified that its cost-benefit analysis assumed that the *"only criterion* for assessing the merit of mandatory ATC installations for use at California retail stations is a net [economic] benefit to consumers." The CEC recommended that the Legislature conduct further research on other potential benefits of implementing ATC technology, including "whether the possible value of increased fairness, accuracy, and consistency of fuel measurement . . . justify mandating ATC at California retail stations." It also recommended "refin[ing]" the method used to determine the value of the benefits that consumers derive from "price transparency."

Plaintiffs' complaint raises numerous issues that have nothing to do with the implementation of ATC technology, including (1) whether Chevron should be required to make certain disclosures to consumers regarding the effect of temperature on the energy content of fuel, and (2) whether Chevron's practice of selling non-temperature-adjusted fuel at the retail level enables it to collect more motor fuel taxes from consumers than it is required to pay to the government. The CEC report did not analyze either of those issues.

Moreover, plaintiffs' complaint seeks to resolve several questions regarding *the benefits of selling temperature-adjusted fuel that were left open by the* CEC report. For example, the complaint alleges that Chevron's practice of selling non-temperature-adjusted fuel harms consumers by obscuring the true price of motor fuel and creating inaccuracies and inconsistencies in the amounts of fuel that consumers receive from each purchase. The CEC emphasized that its report had not adequately addressed either of these possible benefits.

Plaintiffs' complaint raises numerous issues beyond those addressed in the CEC report. At this stage in the proceedings, it would be an abuse of discretion to abstain from deciding such issues merely because the CEC concluded that one possible remedy raised in plaintiffs' complaint—the implementation of ATC technology—would result in a net cost to consumers when measured purely in economic terms.[12]

### B.   *The Trial Court's Orders on Chevron's Demurrers*

The parties have also argued that the trial court erred in ruling on Chevron's demurrers to each of the claims asserted in the second and third

---

[12] Plaintiffs have also argued that, regardless of whether the trial court properly abstained from adjudicating their UCL claims, the court was not permitted to abstain from adjudicating their CLRA claim. Plaintiffs contend that the abstention doctrine may only be applied to equitable claims, and therefore has no application to claims arising under the CLRA, which authorizes the award of legal remedies in the form of damages. Having concluded that the trial court abused its discretion by abstaining, we need not consider this alternative argument.

amended complaints. Plaintiffs argue that the trial court erred in sustaining demurrers to their claims for "unlawful" business practices under section 17200, breach of contract and unjust enrichment. Chevron, in turn, argues that the trial court erred in overruling demurrers to plaintiffs' claims arising under the "unfair" and "fraudulent" prongs of section 17200 as well as their CLRA claim.

### 1. *Standard of review*

"On review of a ruling on demurrer, we exercise our independent judgment on whether, as a matter of law, the complaint states a cause of action. [Citations.] We accept as true the properly pleaded material facts but do not assume the truth of contentions, deductions or conclusions of fact or law. [Citations.] We examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory." (*Coldwell Banker Residential Brokerage Co. v. Superior Court* (2004) 117 Cal.App.4th 158, 163 [11 Cal.Rptr.3d 564].)

### 2. *Plaintiffs' UCL and CLRA claims*

■ The purpose of the UCL "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949 [119 Cal.Rptr.2d 296, 45 P.3d 243].) The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." (§ 17200.) "Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." (*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89].)

■ The purposes of the CLRA are "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (Civ. Code, § 1760.) To further these purposes, the CLRA provides that a defendant may be liable for "unfair methods of competition and unfair or deceptive acts or practices" in the "sale . . . of goods" including "[r]epresenting that goods . . . have . . . characteristics . . . which they do not have . . ." or "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another." (Civ. Code, § 1770, subd. (a)(5), (7).)

Plaintiffs' complaint alleges that Chevron violated section 17200 and the CLRA by committing one or more acts related to the practice of selling motor fuel on a non-temperature-adjusted basis, including, in relevant part (1) failing to adjust the temperature of motor fuel sold at retail to 60 degrees Fahrenheit; (2) representing that consumers receive standard units of motor

fuel, when in fact the amount of motor fuel delivered in each transaction varies depending on temperature; (3) concealing the temperature at which retail motor fuel is sold; (4) concealing that the energy content of motor fuel sold at retail varies according to temperature and that the term "gallon" is not a standard unit of measure; and (5) charging consumers an amount in "purported reimbursement for motor fuel taxes in excess of the amount of fuel taxes actually due and paid at the wholesale level."

### a. *Plaintiffs have alleged facts that demonstrate standing to assert claims arising under the UCL and CLRA*

Chevron argues for the first time on appeal that plaintiffs' complaint does not adequately allege standing to assert either a UCL or CLRA claim. Chevron concedes that, at the pleading stage, a plaintiff asserting a UCL or CLRA claim "satisfies its burden of demonstrating standing by alleging an economic injury." (*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 254 [129 Cal.Rptr.3d 874].)

Plaintiffs' complaint alleges that Chevron's practice of selling non-temperature-adjusted motor fuel causes several "economic" injuries to consumers. First, consumers are required to purchase significantly more fuel to obtain the same amount of energy they would receive if the fuel was sold in temperature-adjusted gallons.[13] (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 325 [120 Cal.Rptr.3d 741, 246 P.3d 877] [standing proper where "the plaintiff alleged he was required to purchase more fuel than he otherwise would have because of the defendants' business practices"].) Second, consumers are unfairly required to pay more in purported taxes than Chevron is required to pay to the government. (*Ibid.* [standing proper "where the plaintiffs alleged they had paid an overcharge—more than they otherwise would have—because of [the alleged unfair practice]"].) Third, by advertising in gallon units without disclosing the effect of temperature on motor fuel, Chevron deceives consumers as to the true price of motor fuel. (See *id.* at p. 329 ["consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase [suffers] . . . economic harm . . ."].) At the pleadings stage, these allegations are sufficient to establish standing.

---

[13] The CEC report supports this allegation, explaining that if ATC technologies had been in place at retail gas stations during the one-year study period, Californians would have purchased "about 117 million gallons less compared to status quo (no ATC at retail outlets) because the fuel was warmer (71.1 degrees Fahrenheit) than the 60 degree Fahrenheit reference standard."

b. *Plaintiffs have stated a claim under the "unfair" prong of section 17200*

■ In consumer cases arising under the UCL, a business practice is "unfair" if (1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves. (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 [48 Cal.Rptr.3d 770] (*Camacho*).)[14] "Whether a practice is . . . unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer. [Citations.]" (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134–135 [61 Cal.Rptr.3d 221].)

Plaintiffs' complaint alleges that Chevron's alleged conduct—failing to sell temperature-adjusted motor fuel or to disclose the effects of temperature increases on motor fuel—is unfair because it causes several harms to consumers. First, consumers are led to believe that each "gallon" unit of gasoline purchased at retail provides the same amount of energy output. Second, it makes it impossible for consumers to determine the true price of motor fuel or to compare prices between retailers. Third, it allows Chevron to charge consumers more in total motor fuel taxes than it is required to pay to the government.

At the pleading stage, we cannot presume that these alleged harms are not "substantial" or are otherwise outweighed by benefits that consumers derive from Chevron's practice of selling non-temperature-adjusted motor fuel at the retail level. (*Camacho, supra,* 142 Cal.App.4th at p. 1403.) Although the evidence in this case may show that consumers do not suffer any substantial injury from the sale of non-temperature-adjusted fuel or that the costs associated with remedying such injuries outweigh any benefit to consumers, we agree with the trial court's conclusion that such issues must "be determined on a developed factual basis."

---

[14] There is currently a split of authority with respect to the proper definition of the term "unfair" in the context of consumer cases arising under the UCL. (See generally *Davis v. Ford Motor Credit Co. LLC* (2009) 179 Cal.App.4th 581, 584, 594–597 [101 Cal.Rptr.3d 697] (*Davis*); *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 256 [106 Cal.Rptr.3d 46] ["Courts of Appeal . . . have applied three different tests for unfairness in consumer cases"].) However, this district has consistently followed the definition enunciated in *Camacho, supra,* 142 Cal.App.4th 1394, 1403, which was decided by Division Eight of this district in 2006. (See *Davis, supra,* 179 Cal.App.4th at p. 596 [*Camacho* "contains an excellent analysis of the issue and we adopt its definition of 'unfair' in consumer cases"]; *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 838–839 [51 Cal.Rptr.3d 118] (*Daugherty*) [applying and following *Camacho*].)

Chevron, however, argues that there are several reasons why acquiring motor fuel in temperature-adjusted gallons at the wholesale level, but selling fuel in non-temperature-adjusted gallons at the retail level, cannot qualify as an "unfair" business practice within the meaning of section 17200.

First, Chevron argues that businesses have "no . . . duty to pass on the benefits of, or disclose to, its retail customers the terms of its actual wholesale level transactions." Chevron's argument is based on *McCann v. Lucky Money, Inc.* (2005) 129 Cal.App.4th 1382 [29 Cal.Rptr.3d 437] (*McCann*), which held that a business could not be held liable under the UCL for failing " 'to disclose their own costs or profit margins.' " (129 Cal.App.4th at p. 1395.) The plaintiff in *McCann* filed a class action complaint alleging that a money transmitter had engaged in an unfair business practice by failing to offer customers the same exchange rate it was able to acquire on the wholesale market. In assessing the plaintiff's claim, the appellate court summarized "the nature of the money transmission transactions" as follows: "[A] customer desiring to send United States dollars to a foreign country may purchase the foreign currency from a money transmitter at one exchange rate, i.e., retail rate. Money transmitters . . . typically purchase the foreign currency at a more favorable exchange rate, i.e., wholesale rate. The difference between the retail exchange rate and the wholesale exchange rate is typically referred to as the ' " 'FX [foreign exchange] spread,' " ' . . . [which] is often a source of additional profit to the money transmitter beyond the fees it charges the customer for the exchange. [Citation]." (*Id.* at p. 1392.) The plaintiff contended that the defendants had violated the UCL by failing "to disclose to the customer that it gets a more advantageous rate of exchange on the wholesale market than it gives the customer, and [failing] to give the customer the benefit of the better exchange rate." (129 Cal.App.4th at p. 1386.)

The appellate court ruled that the plaintiff had failed to state a claim under the UCL, explaining, "[d]efendants are engaged in business for a profit. Their failure to disclose their own costs or profit margins is not, on its face, unfair." (*McCann, supra*, 129 Cal.App.4th at p. 1395.) The court further explained that: " 'Money is just a commodity in an international market. [Citation.] Pesos are for sale—at one price for those who buy in bulk (parcels of $5 million or more) and at another, higher price for those who buy at retail . . . . Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods. The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees. The holder of a checking account may be promised a small interest rate (say, 2%) on the balance and is not told at what

rate the bank lends these funds to its own customers. Nor need the bank, or an intermediary such as [defendant], explain to customers how it profits from the float on funds it holds for a day or two between receipt and delivery." (*Id.* at p. 1396.)

Chevron contends that this case is "indistinguishable" from *McCann* because plaintiffs are, in essence, asserting that Chevron is required to offer consumers a benefit it enjoys at the wholesale level: procuring motor fuel in temperature-adjusted gallons. There are, however, important distinctions between this case and *McCann*. First, the holding in *McCann* has no relevance to plaintiffs' claim that, by selling non-temperature-adjusted fuel at retail, Chevron is able to charge consumers more in purported motor fuel tax than it is required to pay to the government. Plaintiffs' tax-based claim has nothing to do with Chevron's failure to disclose its profit margins or the price at which it procures motor fuel at wholesale.

Second, unlike in *McCann*, the "gist" of plaintiffs' unfairness claim is not that Chevron was required to " 'disclose their own costs or profit margins' " to consumers. (*McCann, supra*, 129 Cal.App.4th at pp. 1395, 1386 ["gist" of plaintiff's claim was that defendant "fails to disclose . . . that it gets a more advantageous rate of exchange on the wholesale market than it gives the customer"].) Instead, plaintiffs argue that, by failing to compensate for temperature variations in retail motor fuel, Chevron is engaging in a practice that misleads consumers as to the actual amount of motor fuel they are purchasing and the actual price that they are paying for that fuel. By contrast, the plaintiff in *McCann* was informed of the specific exchange rate he would receive in his retail transactions (*id.* at p. 1382), but argued that the money transmitter had a duty to disclose the more favorable wholesale rate at which it was able to purchase foreign currency and pass those benefits on to consumers.

Were plaintiffs in this case simply alleging that Chevron had a duty to disclose the price at which it procured motor fuel at wholesale, *McCann* might foreclose such a claim. However, nothing in *McCann* suggests that the UCL does not, as a matter of law, apply to conduct that allows a retailer to charge more in taxes than it is required to pay to the government or to obscure the true cost of goods at retail.

Chevron next argues that California law "expressly" authorizes the sale of non-temperature-adjusted motor fuel at retail and, as a result, such conduct cannot form the basis of a UCL claim. In support, Chevron quotes section 13520, which requires that, in transactions involving the sale of 5,000 or more gallons of motor fuel, the seller must offer the fuel " 'on the basis of temperature-corrected gallonage to 60 degrees Fahrenheit . . . .' " Chevron

contends that "by establishing a 5,000 gallon-threshold for the application of this statute, the Legislature necessarily 'considered' and 'rejected' creating a method of sale for temperature adjusted motor fuels in quantities of less than 5,000 gallons (i.e., standard retail transactions)."

■ Chevron's argument is predicated on *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*), which held that: "If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Id.* at p. 182.) However, *Cel-Tech* also clarified that the safe harbor "rule does not . . . prohibit an action under the unfair competition law merely because some other statute on the subject does not . . . prohibit the challenged conduct. To forestall an action under the unfair competition law, another provision must . . . clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." (*Id.* at pp. 182–183.) The court reiterated this point, stating that a statute that does not "affirmatively permit[] [a type of conduct] . . . does not preclude a court from deeming [such] conduct unfair under the unfair competition law." (*Id.* at p. 187.)

Subsequent cases applying *Cel-Tech* have explained that, to qualify for the "safe harbor" rule, the defendant must show that a statute "explicitly prohibit[s] liability for the defendant's acts or omissions" (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 940, fn. 5 [20 Cal.Rptr.3d 485] (*Krumme*)) or "expressly precludes an action based on the conduct" (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 374 [113 Cal.Rptr.2d 175] ["conduct is not actionable under the unfair competition law if a statute expressly precludes an action based on the conduct"]).

■ Section 13520 does not include any language that expressly precludes UCL liability for selling non-temperature-adjusted fuel at the retail level or that expressly permits such conduct. By its terms, the statute only applies to transactions involving 5,000 or more gallons of motor fuel and therefore has no application to transactions involving lesser quantities of motor fuel. Chevron's contention that we may imply a "safe harbor" because the Legislature has required the sale of temperature-adjusted fuel in wholesale transactions, but not in retail transactions, is directly "contrary to the approach adopted by our Supreme Court [in *Cel-Tech.*]" (*Krumme, supra*, 123 Cal.App.4th at p. 940, fn. 5 [defendants' contention that a safe harbor could be "implied" from an " 'overall statutory scheme' " was "contrary" to Supreme Court's direction that a "safe harbor statute must explicitly prohibit liability for the defendant's acts or omissions"].)

Finally, amici curiae for Chevron argue that selling non-temperature-adjusted motor fuel at the retail level cannot be deemed to be an unfair business practice because California law specifically requires that (1) retailers must dispense motor fuel in "gallons," which is defined by law to mean a volume of exactly 231 cubic inches, and (2) the advertised price of motor fuel may not be altered during the course of a sales transaction. According to amici curiae, as currently written, these rules (which are discussed in more detail in relation to plaintiffs' breach of contract claim) effectively make it illegal to implement temperature-compensating technologies that would adjust either the amount or price of motor fuel during the course of a consumer transaction.

Even if amici curiae are correct that California law effectively prohibits the use of temperature-compensating fuel pump technologies that would alter the quantity or price of motor fuel during each transaction (an issue we need not decide), we are not persuaded by their argument. Amici curiae overlook the fact that implementing temperature-compensating technologies is not the only possible remedy in this case. At this stage in the proceedings, we cannot determine what other remedies might be available that do not require the implementation of ATC or similar technologies. If the trial court ultimately determines that Chevron's conduct violates the UCL, it will have broad discretion to formulate an appropriate remedy. (*Benson, supra*, 152 Cal.App.4th at p. 1277 [" 'very broad' discretion in formulating equitable relief in unfair competition law actions"].)

c.   *Plaintiffs have stated a claim under the "fraudulent" prong of section 17200*

A business practice is "fraudulent" within the meaning of section 17200 if it is "likely to deceive the public. [Citations.] It may be based on representations to the public which are untrue, and ' "also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under" ' the UCL. [Citations.] The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer. [Citation.]" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1471 [49 Cal.Rptr.3d 227] (*McKell*).)

Generally, the question of "[w]hether a practice is deceptive or fraudulent 'cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer.' [Citation.] Rather, the determination is one question of fact, requiring consideration and weighing of evidence from both sides before it can be resolved." (*McKell, supra*,

142 Cal.App.4th at p. 1472.) " '[U]nless we can say as a matter of law that contrary to the complaint's allegations, members of the public were *not* likely to be deceived or misled by [the defendant's alleged conduct], we must hold that [plaintiffs] stated a cause of action.' " (*Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1257 [99 Cal.Rptr.3d 768].)

Plaintiffs have alleged that, by selling motor fuel in non-temperature-adjusted "gallon" units without disclosing the effects of thermal expansion, Chevron has deceived consumers into believing that they are receiving a standard quantity of motor fuel at each purchase. Plaintiffs further allege that Chevron's conduct misleads consumers as to the true price of motor fuel, which varies depending on the temperature at which the fuel is purchased.[15]

At the pleadings stage, we cannot say, as a matter of law, that consumers are not likely to be deceived in the manner alleged by plaintiffs. As the trial court observed, plaintiffs have alleged "facts which, if true, may reveal that members of the public . . . [assumed] that . . . they were receiving standardized units of motor fuel when, in fact, the energy content of each gallon depended on the temperature of the motor fuel at the time of purchase." Plaintiffs have also alleged facts that, if true, may reveal that consumers were deceived as to the true price of motor fuel, which may vary depending on the temperature at which it is sold.

Chevron, however, contends that plaintiffs have failed to state a claim under the "fraudulent" prong of the UCL because they did not plead facts showing that the public had an expectation or assumption about any of the issues in question. In support, Chevron cites *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255 [39 Cal.Rptr.3d 634] (*Bardin*). The plaintiffs in *Bardin* alleged that a car manufacturer had committed a fraudulent business practice when it elected to use tubular steel in the exhaust manifolds of its vehicle, rather than the more durable and expensive cast iron. The plaintiffs' complaint alleged that " '[b]ecause [defendant] ha[d] omitted and concealed material facts about the exhaust manifolds from the public, members of the public were likely to have been deceived about the quality, performance, and durability of those manifolds.' " (*Id.* at p. 1275.)

The appellate court ruled that the plaintiffs' allegations were insufficient to state a cause of action under the "fraudulent" prong of the UCL. The court explained that, "[i]n order to be deceived, members of the public must have had an expectation or an assumption about the materials used in [the] vehicle.

---

[15] Plaintiffs also allege that Chevron's conduct deceives consumers into believing that Chevron is charging consumers the same amount in motor fuel taxes that it is paying to the government. Because we conclude that plaintiffs' other allegations adequately state a claim under the fraudulent prong of the UCL, we need not address this specific claim.

The . . . complaint did not allege . . . members of the public had any expectation or made any assumptions that [the] exhaust manifolds would be made from cast iron, as opposed to tubular steel . . . ." (*Bardin, supra,* 136 Cal.App.4th at p. 1275.)

Here, however, plaintiffs specifically alleged that, because Chevron advertised motor fuel in "gallon" units without disclosing the effects of thermal expansion, members of the public expected and assumed that they would receive a standardized amount of motor fuel in each purchase and that the stated price reflected the actual cost of that fuel. Thus, unlike in *Bardin,* the complaint contains allegations that the public did in fact have an expectation or assumption about the amount and price of fuel they would receive in each transaction.

### d.  *Plaintiffs have stated a claim for violation of the CLRA*

■ The CLRA provides that a defendant may be liable for "[r]epresenting that goods . . . have . . . characteristics . . . which they do not have . . ." or "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another." (Civ. Code, § 1770, subd. (a)(5), (7).) "[T]he practices proscribed by the CLRA . . . include[] 'a proscription against a concealment of the characteristics, use, benefit, or quality of the goods contrary to that represented.' [Citation.]" (*Daugherty, supra,* 144 Cal.App.4th at p. 834; see *McAdams v. Monier, Inc.* (2010) 182 Cal.App.4th 174, 185 [105 Cal.Rptr.3d 704] (*McAdams*) ["in the CLRA context, '[f]raud or deceit may consist of the suppression of a fact by one who . . . gives information of other facts which are likely to mislead for want of communication of that fact' " (italics omitted)].) Thus, a CLRA claim may be predicated on "an alleged failure to disclose a material fact that is misleading in light of other facts . . . that [the defendant] did disclose." (*McAdams, supra,* 182 Cal.App.4th at p. 185; see also *Daugherty, supra,* 144 Cal.App.4th at p. 835 ["to be actionable the omission must be contrary to a representation actually made by the defendant . . ."].)

The standard for determining whether a representation is "fraudulent" under the UCL applies equally to claims arising under the CLRA. (See generally *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 51–54 [134 Cal.Rptr.2d 420] [applying same standard to both claims].) Thus, "[c]onduct that is 'likely to mislead a reasonable consumer' . . . violates the CLRA." (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 680 [38 Cal.Rptr.3d 36].)

The allegations underlying plaintiffs' CLRA claim are essentially identical to those pleaded in support of their UCL claim. Specifically, plaintiffs allege

that, by advertising in "gallon" units without disclosing the effect of temperature on motor fuel, Chevron deceives consumers into believing that they are receiving a standardized quantity of motor fuel at each purchase and that the stated price reflects the true cost of the motor fuel.

Plaintiffs' allegations are sufficient to state a CLRA claim predicated on a material omission, which " 'consist[s] of the suppression of a fact by one who . . . gives information of other facts which are likely to mislead for want of communication of that fact.' " (*McAdams, supra*, 182 Cal.App.4th at p. 185, italics omitted.) Plaintiffs allege that Chevron's failure to disclose the effect of temperature on motor fuel is deceptive because it advertises the price of its product in what consumers understand to be standardized units (gallons). Stated differently, plaintiffs allege that Chevron provided information to the consumer (a stated price in "gallon" units) that was deceptive in light of its omission of other relevant information (the amount of energy output in a gallon of motor fuel depends on the temperature at which it is sold).

### e. *Plaintiffs have stated a claim for an "unlawful" business practice*

Section 17200's "unlawful" prong "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1505 [82 Cal.Rptr.2d 368].) " '[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a] predicate for a . . . [section] 17200 "unlawful" violation.' [Citation.]" (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 681 [43 Cal.Rptr.3d 148]; see also *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539 [72 Cal.Rptr.3d 888].) In this case, the trial court ruled that plaintiffs failed to state a claim under the UCL's "unlawful" prong because they had not identified any statute that prohibited Chevron from selling non-temperature-adjusted fuel at retail or charging consumers more in motor fuel taxes than it was required to pay to the government.

The trial court's ruling overlooks the fact that a violation of the CLRA, which "declares numerous practices in the sale of goods or services to consumers to be unlawful" (*In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, 128 [103 Cal.Rptr.3d 83]), may form the predicate "unlawful act" for the purposes of a UCL claim. (See *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1383 [108 Cal.Rptr.3d 669] [plaintiff properly stated cause of action under unlawful prong based on defendant's "alleged violation of . . . provisions of the CLRA that pertain to misrepresentations and deceptive advertising in the sale of goods or services"]; see also *Daugherty, supra*, 144

Cal.App.4th at p. 837 [because plaintiff had failed to state a claim under the CLRA, she had also failed to state a claim under the "unlawful" prong.) As discussed above, plaintiffs' complaint adequately states a claim for violation of the CLRA. As a result, they have also properly stated a claim under the "unlawful" prong of section 17200.

### 3. *Plaintiffs failed to state a claim for breach of contract*

#### a. *Summary of plaintiffs' breach of contract claim*

Plaintiffs' breach of contract claim alleges that consumers enter into a sales contract with Chevron each time they purchase motor fuel at the advertised price per gallon. According to plaintiffs' complaint, Chevron's offer—which is accepted by consumers at the time of purchase—consists of two separate statements: (1) an advertised price per gallon of motor fuel, and (2) the statement "$ price per gallon including taxes."

Plaintiffs contend that Chevron's practice of selling non-temperature-adjusted motor fuel breaches this sales agreement in two ways. First, plaintiffs allege that consumers reasonably understand that Chevron's use of the term "gallon" refers to U.S. Petroleum Gallons, rather than volumetric gallons that do not compensate for temperature. In other words, consumers understand that Chevron is offering motor fuel in units of 231 cubic inches at a temperature of 60 degrees Fahrenheit. Second, plaintiffs allege that consumers reasonably interpret the statement "$ price per gallon including taxes" to mean that Chevron is "collecting reimbursement for taxes actually paid on each gallon . . . purchased" when, in fact, Chevron charges consumers more taxes on each gallon of motor fuel than it is required to pay to the government.

The trial court sustained Chevron's demurrer to plaintiffs' breach of contract claim, concluding that (1) consumers could not reasonably interpret the term "gallon" to mean U.S. Petroleum Gallons, and (2) the phrase "$ price per gallon including taxes" could not be reasonably interpreted as a promise by Chevron to charge consumers the same amount in purported taxes that it pays to government authorities.

#### b. *General principles of contract interpretation at the demurrer stage*

When reviewing whether a plaintiff has properly stated a cause of action for breach of contract, we must determine whether the alleged agreement is "reasonably susceptible" to the meaning ascribed to it in the complaint. (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 964

[110 Cal.Rptr.3d 890].) " 'So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.' [Citation.]" (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 [282 Cal.Rptr. 233] (*Aragon-Haas*); see also *Connell v. Zaid* (1969) 268 Cal.App.2d 788, 795 [74 Cal.Rptr. 371] ["in considering a pleading attacked by general demurrer," plaintiff's " 'construction of . . . [the contract] should be accepted, if such construction be reasonable' "].) Thus, to survive demurrer, plaintiffs need only set forth a reasonable interpretation of their sales contract with Chevron.

■■■ The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see also Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 [76 Cal.Rptr.3d 585].) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"], 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . ."].) The words are to be understood "in their ordinary and popular sense." (Civ. Code, § 1644.)

       c.   *Plaintiffs' proposed interpretation of the term "gallon" conflicts with the ordinary meaning of that term and the definition ascribed under California law*

We first consider whether the term "gallon" can be reasonably interpreted as an offer to sell 231 cubic inches of motor fuel at 60 degrees Fahrenheit. The word "gallon" is defined as "a unit of liquid capacity equal to 231 cubic inches." (Webster's 3d New Internat. Dict. (2002) p. 931.) Therefore, in its normal usage, the word "gallon" reflects a volumetric measurement without reference to temperature. Plaintiffs' contention that the word "gallon" includes a temperature component is contrary to the ordinary and popular meaning of that term. (Civ. Code, § 1644 [when interpreting a contract, words are to be understood "in their ordinary and popular sense"].) Moreover, plaintiffs' interpretation would effectively require us to read language into the offer—that motor fuel will be delivered in gallon units *at a specified temperature*—that does not exist. Such an interpretation would violate the well-established principle that, when "constru[ing] an instrument, . . . [courts may] 'not . . . insert what has been omitted, or . . . omit what has been

inserted . . . .' " (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954 [81 Cal.Rptr.3d 282, 189 P.3d 285] (*Edwards*) [citing and quoting Code Civ. Proc., § 1858].)

Plaintiffs' proposed construction of the term "gallon" also conflicts with the definition that has been assigned to that term under state law. California's weight and measurement laws incorporate the "latest standards . . . published in the National Institute of Standards and Technology Handbook 44" (§ 12107), which lists "[t]he specifications, tolerances, and other technical requirements . . . adopted by the National Conference on Weights and Measures." (National Institute of Standards and Technology (NIST) Handbook 44 (2011) Introduction, p. 1 (Handbook 44).) Handbook 44 requires that "Retail Motor-Fuel Devices" deliver fuel "in liters or gallons and decimal subdivisions or fractional equivalents thereof." (Handbook 44, *supra*, § 3.30-S.1.2.1, at p. 3-5.) The Handbook defines the term "gallon" to mean "231 cubic inches (exactly)" (*id.*, appen. C at pp. C-17 & C-5), and clarifies that a "gallon" is a "unit" of measurement that is "fixed by definition and is independent of such physical conditions as temperature." (*Id.*, appen. B at p. B-3.) Thus, for the purposes of retail motor fuel transactions, California has made no reference to temperature in defining the term gallon.

▮ "As a general rule, ' "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ' [Citation.]" (*Swenson v. File* (1970) 3 Cal.3d 389, 393 [90 Cal.Rptr. 580, 475 P.2d 852]; see *Edwards, supra*, 44 Cal.4th at pp. 954–955 [ruling that settlement language releasing "any and all claims" could not be interpreted as waiving indemnity rights because Lab. Code, § 2804 precluded the waiver of such rights and impliedly formed a part of the contract].) Accordingly, by operation of law, Chevron's use of the term "gallon" in its sales agreement has a specified meaning that plainly conflicts with plaintiffs' proposed definition of that term. (*Edwards, supra*, 44 Cal.4th at p. 954 ["when courts construe an instrument, a judge is 'not to insert what has been omitted, or to omit what has been inserted . . .' "].)

      d.   *Plaintiffs' interpretation of the phrase "$ price per gallon including taxes" is not reasonable*

Plaintiffs also contend that Chevron's sale of non-temperature-adjusted fuel breaches a term of the sales agreement stating: "$ price per gallon including taxes." Plaintiffs allege that consumers reasonably interpret this language to mean that, for each gallon of motor fuel purchased at retail, Chevron is

charging consumers the same amount of taxes that it is required to pay to the government when it acquires the motor fuel.

Plaintiffs' proposed construction of the phrase "$ price per gallon including taxes" is "clearly erroneous." (*Aragon-Haas, supra*, 231 Cal.App.3d at p. 239 [" 'So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.' [Citation.]"].) The phrase "$ price per gallon including taxes" indicates nothing more than that the advertised price of motor fuel is inclusive of all taxes charged to the consumer. Plaintiffs' interpretation would read language into the statement—that the price per gallon includes taxes in *an amount identical to that paid by Chevron at the wholesale level*—that does not exist.

Because plaintiffs' complaint does not set forth a reasonable interpretation of their alleged sales agreement with Chevron, the trial court did not err in sustaining Chevron's demurrer to the breach of contract claim, and in dismissing the claim without leave to amend.[16]

### 4. *The trial court did not err in sustaining Chevron's demurrer to plaintiffs' unjust enrichment claim*

Plaintiffs' second amended complaint alleged that Chevron had been "unjustly enriched to the detriment of [consumers] on the sale of volumetric gallons of motor fuel in excess of 60 degrees Fahrenheit." In its demurrer to the second amended complaint, Chevron argued that unjust enrichment was a "quasi-contract" claim that was unavailable in cases where the " 'parties have an actual contract covering a subject.' " Chevron further argued that because the plaintiffs' breach of contract claim "allege[d] the existence of a *valid contract* between the parties for the sale of motor fuel," they were prohibited from asserting a claim for unjust enrichment. The trial court agreed, ruling

---

[16] Generally, when a demurrer to a claim is sustained without leave to amend, we must also decide "whether there is a reasonable possibility that the defect can be cured by amendment . . . ." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 [62 Cal.Rptr.3d 614, 161 P.3d 1168].) In making this determination we consider "whether the plaintiff has shown 'in what manner he [or she] can amend [the] complaint and how that amendment will change the legal effect of [the] pleading.' [Citation.] '[L]eave to amend should not be granted where . . . amendment would be futile.' [Citation.]" (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 414–415 [37 Cal.Rptr.3d 528].) Here, plaintiffs have argued only that the trial court erred in sustaining the demurrer to their breach of contract claim because the "interpretation of [Chevron's] offer [set forth in the third amended complaint] is reasonable." Plaintiffs have not argued that they should be afforded an opportunity to amend their claim nor have they offered any possible amendments that would render their claim nonfutile. Accordingly, we affirm the trial court's decision to dismiss this claim without leave to amend.

that plaintiffs had failed to state a claim for unjust enrichment "because of their allegation that agreements exist defining the parties' rights (in the breach of contract claim). While generally parties are permitted to plead in the alternative, the allegation of binding contracts nullifies the unjust enrichment claim."

On appeal, plaintiffs argue that although they may not ultimately recover for both breach of the sales agreement and unjust enrichment, they are nonetheless entitled to pursue both claims at this stage in the proceedings. It is true that modern rules of pleading generally permit plaintiffs to "set forth alternative theories in varied and inconsistent counts." (*Rader Co. v. Stone* (1986) 178 Cal.App.3d 10, 29 [223 Cal.Rptr. 806]; see *Mendoza v. Continental Sales Co., Inc.* (2006) 140 Cal.App.4th 1395, 1402 [45 Cal.Rptr.3d 525] ["the modern practice allows that party to plead in the alternative and make inconsistent allegations"].) Thus, if a plaintiff was uncertain as to whether the parties had entered into an enforceable agreement, the plaintiff would be entitled to plead inconsistent claims predicated on both the existence and absence of such an agreement. (See *Rader Co. v. Stone, supra*, 178 Cal.App.3d at p. 29 [plaintiff "is not precluded by law from alleging in one cause of action the breach of a contract and an inconsistent theory of recovery in another cause of action"].)

A plaintiff may not, however, pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter. For example, in *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410 [49 Cal.Rptr.2d 191] (*Hedging Concepts*), the trial court determined that although the parties had "formed a contract," the plaintiff had failed to perform a required contingency and was therefore ineligible to recover for breach of contract. (*Id.* at pp. 1418–1419.) Despite this finding, the trial "went on to award [plaintiff] a quantum meruit recovery for the reasonable value of services performed plus costs." (*Id.* at p. 1418.)

The appellate court reversed the award, explaining that "[a] quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. [Citations.] However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation. . . . [¶] . . . [¶] The trial court violated the rule that equitable entitlement to a quantum meruit payment is not implied where the parties have actual contract terms covering payment. . . . [¶] When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." (*Hedging Concepts, supra*, 41 Cal.App.4th at p. 1420, citation omitted.)

The appellate court reached a similar conclusion in *California Medical Association v. Aetna U.S. Healthcare of California* (2001) 94 Cal.App.4th 151 [114 Cal.Rptr.2d 109] (*California Medical*). The plaintiff in *California Medical* initially filed a breach of contract claim alleging breach of express contract, breach of implied contract and breach of third party beneficiary contract. The trial court sustained a demurrer to each claim, but granted plaintiff "leave to amend to attempt to allege a claim for quasi-contract." (*Id.* at p. 157.) Plaintiff then filed an amended complaint "seeking to state a quasi-contract claim against defendants for recovery of the amount of the reasonable value of services rendered to defendants[] . . . ." (*Id.* at p. 158.) The amended complaint included references to several contracts that covered the same subject matter as their quasi-contract claim. (See *id.* at pp. 170–171.) The trial court sustained a demurrer to the amended complaint and dismissed the action. The appellate court affirmed, explaining that plaintiff could "not proceed on its quasi-contract claim because the subject matter of such claim . . . was governed by express contracts . . . as specifically alleged in [plaintiff's] second amended complaint . . . ." (*California Medical, supra*, 94 Cal.App.4th at pp. 172–173; see also *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 [108 Cal.Rptr.3d 682] (*Durell*) [affirming demurrer to unjust enrichment claim because plaintiff "allege[d] the parties entered into express contracts"].)

In this case, plaintiffs' complaint alleges that consumers entered into an enforceable contract with Chevron each time they purchased motor fuel at an advertised price per gallon: "Plaintiffs and class members purchased motor fuel from Defendants at their retail outlets. Each such purchase was, and is, a contract . . . ." They further allege that Chevron breached the contract by selling non-temperature-adjusted motor fuel. Plaintiffs' unjust enrichment claim does not allege that this contract is unenforceable or that the parties did not have a contract governing the sale of motor fuel. Indeed, the plaintiffs' pleadings and briefs do not provide any explanation as to why the consumer sales agreement referenced in their breach of contract claim might be unenforceable or otherwise not qualify as a contract.

Although a plaintiff may plead inconsistent claims that allege both the existence of an enforceable agreement and the absence of an enforceable agreement, that is not what occurred here. Instead, plaintiffs' breach of contract claim pleaded the existence of an enforceable agreement and their unjust enrichment claim did not deny the existence or enforceability of that agreement. Plaintiffs are therefore precluded from asserting a quasi-contract

claim under the theory of unjust enrichment. (*California Medical, supra,* 94 Cal.App.4th at pp. 173–174; *Durell, supra,* 183 Cal.App.4th at p. 1370.)[17]

## DISPOSITION

The trial court's order granting Chevron's motion for judgment on the pleadings is reversed. The trial court's order on Chevron's demurrer to plaintiffs' third amended complaint is affirmed. The trial court's order on Chevron's demurrer to plaintiffs' second amended complaint is reversed to the extent it sustained Chevron's demurrer to plaintiffs' claim arising under the "unlawful" prong of section 17200. Appellants are to recover their costs on appeal.

Woods, Acting P. J., and Jackson, J., concurred.

A petition for a rehearing was denied February 24, 2012, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied May 9, 2012, S200594. Baxter, J., and Corrigan, J., did not participate therein.

.

---

[17] The trial court sustained Chevron's demurrer to the unjust enrichment claim without leave to amend. As with their breach of contract claim, plaintiffs have not argued that they should be afforded an opportunity to amend their unjust enrichment claim nor have they offered any possible amendments that would render the claim nonfutile. Accordingly, we affirm the trial court's decision to dismiss this claim without leave to amend.